UNITED STATES of America, Plaintiff–Appellant–Cross–Appellee,

v.

Brenda Lee WORKING, Defendant–Appellee–Cross–Appellant.

Nos. 98–30121, 98–30122.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 12, 1999

Filed May 6, 1999

Rehearing En Banc Granted Opinion Withdrawn Nov. 1, 1999

Argued and Submitted March 21, 2000

Filed Sept. 11, 2000

---

Karin B. Hoppmann, United States Department of Justice, Criminal Division, Washington, D.C., for the plaintiff-appellant, cross-appellee.

Wayne C. Fricke, Law Offices of Monte E. Hester, Inc., P.S., Tacoma, Washington, for the defendant-appellee, cross-appellant.

Before: HUG, Chief Judge, JAMES R. BROWNING, SCHROEDER, PREGERSON, REINHARDT, KLEINFELD, HAWKINS, SILVERMAN, McKEOWN, WARDLAW and FLETCHER, Circuit Judges.

Opinion by Judge SILVERMAN; Dissent by Judge WARDLAW.

SILVERMAN, Circuit Judge:

In *Koon v. United States*, 518 U.S. 81, 97–98, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996), the Supreme Court said:

> We agree that Congress was concerned about sentencing disparities, but we are just as convinced that Congress did not intend, by establishing limited appellate review, to vest in appellate courts wide-ranging authority over district court sentencing decisions.

> .     .     .     .     .

> A district court's decision to depart from the Guidelines ... will in most cases be due substantial deference, for it embodies the traditional exercise of discretion by a sentencing court.

This important principle of appellate judicial restraint is put to the test in this case. The defendant pled guilty to assault with intent to commit murder and using a firearm in a crime of violence. Finding that the defendant's behavior was aberrant, the district court granted a twenty-one level downward departure on the assault charge. Given the substantial deference we are required to accord such decisions and the existence of evidence supporting it, we hold that the district court did not abuse its discretion in making a finding of aberrant conduct. On the other hand, because the district court failed to "explain the reasoning for ... the ... *degree* of the departure in sufficiently specific language to allow appellate review," *United States v. Henderson*, 993 F.2d 187, 189 (9th Cir.1993) (emphasis added), we vacate the sentence and remand to the district court for resentencing to be accompanied by an explanation for the degree of the departure it grants.

I.

We start our recitation of the facts with an important premise: Michael Working was the victim of the criminal behavior at issue in this case. A judicial examination of whether the defendant's behavior was aberrant in no way minimizes the serious-

ness of the crime or its impact on Mr. Working, or justifies its commission.

Brenda and Michael Working were married on September 8, 1990. Brenda and Michael have two daughters. Michael also has children, including two sons, Mitch and Micha, from a previous marriage. Evidence in the record indicates that Brenda and Michael's marriage was volatile from the beginning, as was Michael's relationship with his sons. In 1993, Michael kicked seventeen-year-old Micha out of the family home.

The couple's marital difficulties came to a head in 1997 when Michael discovered Brenda sleeping next to his teenage son Mitch on a make-shift bed. Brenda stated that she, Mitch, and the girls merely fell asleep on a make-shift bed in the living room while watching television. In any event, according to Brenda, Michael threatened to use that incident to obtain legal custody of the girls by falsely and scurrilously alleging that she had engaged in sexual misconduct with her minor stepson. She also claims that he threatened to fabricate details in order to gain custody. Shortly thereafter, Michael moved out of the house and into a cottage located on the property. He filed for divorce a few months later and did, indeed, petition for sole custody of the girls, alleging that Brenda and his minor son were engaged in an improper sexual relationship. A show cause hearing for temporary custody was scheduled for August 7, 1997.

On July 23, 1997, Brenda purchased a .38–caliber handgun from a pawn shop. She picked up the gun a week later, on August 1, 1997, six days before the show cause hearing. At approximately 10:45 p.m that evening, Brenda called Michael and told him that her mini-van had broken down on a road that runs through the military base of Fort Lewis, Washington. She asked him to come and pick up their two daughters.

Michael arrived at the Fort Lewis road at around 11:00 p.m. While Michael was still seated in his Ford Bronco, Brenda approached the vehicle, pulled out the handgun and began shooting at Michael. Although Michael tried to duck into the passenger seat, he was hit in his left arm and shoulder. After Brenda emptied the handgun and stopped shooting, Michael was able to re-start the Bronco, and he drove it into some bushes where he climbed out.

Brenda reloaded the gun and followed Michael. Michael started to run, but Brenda shot him again, wounding him in the back. Michael then turned and rushed Brenda. As the two struggled, Brenda hit Michael in the head with the gun several times. Michael struck Brenda in the face twice and then fled into the near-by bushes to hide. Brenda tried to find Michael by driving her minivan back and forth along the road so that its headlights illuminated the bushes. She looked for Michael for over an hour but, failing to find him, returned to her home in the early morning of August 2.

After she returned home, Brenda attempted to wash bloodstains from the hood of her car. She also burned her soiled clothing and hid her broken eye glasses. She then called 911 to report her husband for domestic violence. Brenda told police that she and Michael had argued at the house and that he had struck her; she denied seeing Michael after he left the residence. However, once the police confronted her with the fact that they had found her husband alive, she recanted her story. She admitted to owning a .38–caliber handgun, which she handed over to police. She also consented to a search of her residence and the minivan, where police located traces of blood.

\* \* \*

Brenda pled guilty to assault with intent to commit first degree murder, in violation of 18 U.S.C. § 113(a)(1), and to use of a firearm in relation to a crime of violence, in violation of 18 U.S.C. § 924(c) (since amended). With respect to the assault offense, Brenda argued for a downward departure from the relevant Sentencing Guidelines for aberrant behavior. She

also argued that the district court had the authority to grant a departure from the statutory minimum sentence of five years for the firearm offense.

At sentencing, Brenda presented evidence in support of her request for a departure for aberrant conduct. First was a psychiatric evaluation performed by Sean M. Killoran, M.D. It concluded that Brenda was suffering from severe depression at the time of the shooting. Dr. Killoran wrote:

It can be stated with a reasonable degree of medical certainty that the defendant suffered from a major depressive disorder at the time of the charged offense and that her ability to recall and reconstruct the events in her mind had been impaired by the concurrent diagnosis of an acute dissociative episode. ... The severity of her depressive symptoms at the time of the offense and her sense of hopelessness coupled with the desperate quality of her situation markedly impaired her usual judgment and decision making.[1]

Dr. Killoran also reported that Brenda was under "extreme pressure" at the time of the shootings, which was related in part to her concern that she might lose custody of her two daughters due to Michael's accusations of sexual misconduct. Dr. Killoran also noted that "[h]er past behavioral history reflects a life-long adherence to conventional values, a law-abiding lifestyle, and a lack of previous aggressive behavior." In light of Brenda's behavioral history, Dr. Killoran also opined that the shooting was "markedly out of character for the defendant in terms of her behavioral background, and there is no psychiatric evidence that it was consciously planned."

Second, the district court had before it several letters written by friends and family on Brenda's behalf. Of particular significance to the district court were letters written by Michael's two sons, Micha and Mitch. Micha's letter stated in part:

I am writing this letter on behalf of Brenda in hopes that you will show her leniency. I understand that Brenda shot my Dad, but if you only knew him like any one of us who has lived with him then you might begin to understand how he pushes and pushes a person until they completely go over the edge. I know, because I have been driven there more times than I can count by my Dad.

⋅ ⋅ ⋅ ⋅ ⋅

[The arguments with my Dad] all follow the same basic outline. Any little argument that may come up and Dad cannot stop. Even when the other person tries to walk away, even when that person starts to cry. My Dad will not stop until he has completely broken his victim down. He will keep pushing and twisting words until a small disagreement has turned into a major altercation. The other person is left reeling and so confused they don't know which way is up.[2]

Michael's other son, Mitch, wrote to the judge:

Brenda Working has been my mother since I was nine years old. She has been there for me every step of the way. She is not a stepmother to me, she is a mom, a friend, and a teacher.... She is not a violent person, she is a talker and likes to work things out. I feel if it wasn't for her and her family I would

**1.** The report also indicated that this was not Brenda's first experience with depression. In late 1996, Brenda sought counseling for depression and feelings of "helplessness." She consulted her family physician, who prescribed the antidepressant Paxil. She also entered into short-term psychotherapy. Although the medication and the counseling appeared to offer the defendant some initial relief, her separation from Michael and what she reported as his increasingly abusive behavior prompted a return of symptoms including "free floating anxiety, a sense of intimidation, marked insomnia and impaired self-esteem."

**2.** At the time of sentencing, Micha had petitioned for custody of Brenda and Michael's two daughters.

not be the strong person and as successful as I am today.

.　　.　　.　　.　　.

She is a believer in right and wrong and I still believe that. She is not a person that belongs behind bars but a person that needs a little help from a bad person that knows how to turn minds around if you let him. 'My two little sisters and me need her. My sisters need their mom to live a life like little girls should. Brenda would stay up nights to be with the girls when they were sick, because she loves them more than the world. By the time you get this letter she has already served 3 months in jail and a way [sic] from her family.

I feel that instead of throwing the key away and sending her off she should get probation and your release for there are two very special girls that really need her. I will always be their [sic] for this woman know [sic] matter what, because she brought me up instead of dad.

Next, the district court had before it Brenda's testimony at sentencing. She denied physical abuse but claimed to be a victim of verbal and emotional abuse extending over a period of years. She testified in part:

> [W]hat he does is he yells at you and towers over you and threatens you to take the kids away and he pushes and he shoves. And just puts the fear in you. And it got to the point it was almost daily there through July.

Brenda testified that at the time of the shooting: "I became somebody I don't know because ... I just wanted him [Michael] to shut up and stop screaming and threatening and hurting [us]." She also expressed remorse for her actions, stating that she was "truly devastated by this and I'm sorry ... for what I've done and I'm sorry to Mike."

Finally, the district court had before it the Presentence Report, which indicated that Brenda lacked any criminal record whatsoever.

After considering all of this evidence, the district court concluded that Brenda's behavior was aberrant. In so finding, the court discussed, on the record and in open court, each of the seven factors relevant to aberrant behavior enumerated by this court in *United States v. Colace*, 126 F.3d 1229, 1231 n. 2 (9th Cir.1997). Specifically, the court found that the shooting was singular in nature, and that Brenda had no prior criminal record. The court also accepted Dr. Killoran's opinion that Brenda was suffering from "significant depression" at the time of the offense. Next, the court found that Brenda was operating under extreme pressures resulting from Michael's accusation of sexual misconduct and the potential loss of custody of the children. The court also took account of the numerous letters from family and friends in support of Brenda, especially the letters from Michael's sons. Finally, the court concluded:

> Here, there's no question in this Court's mind that what happened was the pressure of losing her two daughters.

.　　.　　.　　.　　.

> The evidence seems to show that the pressure which she was under is when the victim in the case accused her of having sexual relations with one of his minor sons. I think that set off this whole case.

Under the relevant sentencing guidelines, Brenda's total adjusted offense level for the assault was calculated to be twenty-nine. With a Criminal History Category I, the sentencing range was 87 to 108 months. *See* 18 U.S.C. § 113(a)(1); U.S.S.G. 2A2.1(a)(1) and (b)(1)(A); 3E1.1(a) and (b)(2). Finding that Brenda's conduct was aberrant and warranted departure, the court departed downward twenty-one levels to level eight, which appears to represent the minimum departure necessary to bring the applicable sentencing range to zero-to-six months. *See* U.S.S.G. Ch. 5 Pt. A (Sentencing Table). However, the court offered no explanation

for why it departed to the degree that it did.

The court sentenced the defendant to one day in prison for assault. As for the firearms charge, the court concluded that it lacked the authority to depart from the statutory minimum sentence, and accordingly sentenced Brenda to the five-year minimum term in prison. As required by 18 U.S.C. § 924, the court ordered this five-year sentence to run consecutively to the one-day sentence. In other words, Brenda's prison sentence totaled five years and one day. The district court further noted that it would have departed from the five-year mandatory minimum if it had had the authority to do so.

The government appealed the sentence imposed by the district court. Although it conceded that aberrant behavior can justify a downward departure, the government maintained that the district court erred in finding Brenda's behavior aberrant in this case. The government also argued that the court abused its discretion with regard to the extent of departure. Brenda cross-appealed, contending that the district court had the discretion to depart downward from the firearm offense's mandatory minimum five-year sentence. A panel of this court affirmed the district court's sentence. *See United States v. Working,* 175 F.3d 1150 (9th Cir.1999). We granted review en banc.

## II.

■ The Supreme Court has significantly curtailed appellate review of departure decisions. In *Koon,* the Court adopted the "unitary abuse-of-discretion standard" described in *Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 403, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990). *See Koon,* 518 U.S. at 99, 116 S.Ct. 2035. Under this standard, the district court is entitled to deference on most departure issues, including "[w]hether a given factor is present to a degree not adequately considered by the Commission, or whether a discouraged factor nonetheless justifies departure because it is present in some unusual or exceptional way.…" *Id.* at 98, 116 S.Ct.

2035. As the Supreme Court explained, district courts are accorded such deference because they "have an institutional advantage over appellate courts in making these sorts of determinations, especially as they see so many more Guidelines cases than appellate courts do." *Id.*

The Sentencing Guidelines allow for a downward departure in an atypical case where the language of a guideline is applicable but where the defendant's conduct differs significantly from the norm or the "heartland" of cases addressed by the guideline. *See* U.S.S.G. Ch. 1, Pt. A, 4(b). A departure is warranted only if " 'there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described.' " U.S.S.G. § 5K2.0 (quoting 18 U.S.C. § 3553(b)).

■ As the government acknowledges, a finding of aberrant conduct can serve as a justification for a downward departure from the relevant guidelines. *See* U.S.S.G. Ch. 1, Pt. A, 4(b); *Colace,* 126 F.3d at 1231; *United States v. Green,* 105 F.3d 1321, 1322 (9th Cir.1997); *United States v. Fairless,* 975 F.2d 664, 667 (9th Cir.1992). Aberrant conduct is conduct that represents a "short-lived departure from an otherwise law-abiding life." *Colace,* 126 F.3d at 1231. In evaluating whether a defendant's behavior falls under the "spectrum of aberrant behavior," the district court may consider "a convergence of factors." *Fairless,* 975 F.2d at 667. This includes:

(1) the singular nature of the criminal act, (2) spontaneity and lack of planning, (3) the defendant's criminal record, (4) psychological disorders the defendant was suffering from, (5) extreme pressures under which the defendant was operating, … (6) letters from friends and family expressing shock at the defendant's behavior, and (7) the defendant's motivations for committing the crime.

*Colace,* 126 F.3d at 1231 n. 2 (9th Cir. 1997). Here, the district court explicitly considered all of these factors; furthermore, there was evidence in the record to support its findings concerning them.

First, there was evidence from which the district court could find that the shooting was a singular event. This was not a crime spree. Nor do these facts involve a continuous and well-coordinated crime that took place over a long period of time. *See, e.g., Colace,* 126 F.3d at 1230 (defendant robbed at least twelve banks in a two-month period); *Green,* 105 F.3d at 1322 (defendant took part in a well-coordinated operation to manufacture and cultivate over four thousand marijuana plants for no reason other than financial gain). Moreover, Brenda had no prior criminal record, which is another of the *Colace* factors.

■ The evidence also supports the district court's determination that the defendant was suffering from significant depression and psychological pressures at the time of the offense. Brenda had been treated for depression prior to the shooting. In addition, the psychiatric evaluation conducted by Dr. Killoran concluded that Brenda was suffering from a "major depressive disorder" at the time of the offense. This conclusion was based on Dr. Killoran's review of the defendant's medical records, journal entries prepared by the defendant from December 1996 to July 1997, and on a series of diagnostic interviews he had with the defendant. Although a second psychiatric examination of the defendant, made pursuant to a court order, determined that Brenda "did not suffer from a mental disease or defect that made her unable to form the necessary intent to commit the act," this finding is not inconsistent with Dr. Killoran's findings that the defendant suffered from a significant depression. In any event, to the extent that there was a conflict in the evidence, it is within the exclusive province of the district court to resolve evidentiary inconsistencies. *See Inwood Lab. v. Ives Lab.,* 456 U.S. 844, 856–58, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982) (stating that the weight to be assigned to evidence is strictly within the province of the trier of fact, unless the findings are clearly erroneous).

Similarly, the evidence in the record supports the district court's finding that Brenda was operating under severe psychological pressures when she committed the offense. Brenda testified about her fear that Michael would gain custody of their daughters. This testimony was corroborated by Dr. Killoran's evaluation of Brenda, which stated that she was under "extreme pressure" at the time of the shooting.

■ It was also proper for the district court to consider letters from Michael's sons, Micha and Mitch, as well as from other friends and family. These letters provided additional support for the finding that the shooting represented an isolated incident, and one that was out of character for the defendant. Moreover, the letters highlighted the defendant's strong familial ties with her own, and Michael's, children. This has been held to be an appropriate consideration. *See United States v. Pena,* 930 F.2d 1486, 1494–95 (10th Cir.1991).

Finally, the district court appropriately considered the factor of Brenda's motivations for committing the crime, namely, the protection of her family.

Thus, the district court did not err in concluding that six of the *Colace* factors weigh squarely in Brenda's favor. Again, it must be remembered that none of these factors, singularly or in combination, justifies or excuses Brenda's conduct in any way. However, as *Colace* teaches, they do bear upon whether she acted out of character on the day in question.

The government seriously disputes only one factor, and argues that the shooting cannot be considered aberrant as a matter of law because it was not "spontaneous." While our past decisions may have "to some extent relied on the concept of 'singularity or spontaneity'" in making the aberrant behavior determination, *Green,* 105 F.3d at 1323 (quoting *United States v. Lam,* 20 F.3d 999, 1004 (9th Cir.1994)), we

have never held that any single factor was dispositive. *See id.* at 1323. In fact, our case law is consistent in its recognition that the *totality* of the circumstances are to be reviewed when making findings of aberrancy. *See Colace,* 126 F.3d at 1231 (determination to be made based on "convergence of factors" and the "totality of the circumstances"); *Lam,* 20 F.3d at 1003 (analyzing "combination of factors" to find that defendants' conduct was aberrant); *Fairless,* 975 F.2d at 667 (reviewing court must consider "totality of circumstances"); *United States v. Takai,* 941 F.2d 738, 743 (9th Cir.1991) (same).

■ Aberrancy and spontaneity can be related but they are two different things. A mercy killing, for example, may represent a single "departure from an otherwise law abiding life" yet still be the result of thought and planning. By the same token, the actions of an irrational hothead who suddenly punches someone in the nose might be spontaneous, but not aberrant if he has done it before. As the Second Circuit aptly observed, aberrant behavior is best assessed " 'in the context of the defendant's day-to-day life' rather than solely 'with reference to the particular crime committed.' " *United States v. Martinez,* 207 F.3d 133, 137 (2d Cir.2000) (quoting *Zecevic v. United States Parole Comm'n,* 163 F.3d 731, 735 (2d Cir.1998)); *see also United States v. Garcia,* 182 F.3d 1165, 1176 (10th Cir.1999) (fact that defendant's crime was "carefully planned" did not preclude finding of aberrant behavior; the correct focus is " 'not on the number of discrete acts undertaken by the defendant' " but rather on the aberrational character of the conduct) (quoting *United States v. Jones,* 158 F.3d 492, 500 (10th Cir.1998)). Moreover, to require that aberrant conduct be spontaneous and thoughtless would mean that it could never be used as a basis for departure in any case requiring proof of intent or evidence of forethought, and we know that this is not so. *See, e.g., Fairless,* 975 F.2d at 667 (upholding aberrant behavior departure in an armed robbery case); *Takai,* 941 F.2d at 743 (affirming decision to depart for aberrant behavior in a bribery and conspiracy case); *Pena,* 930 F.2d at 1494 (affirming aberrant behavior departure in drug smuggling case).

.    .    .    .    .

We are respectful of the substantial deference appellate courts are required to accord the district court's departure decisions. As the Supreme Court said in *Solem v. Helm,* 463 U.S. 277, 290 n. 16, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983), "[I]t is not the role of an appellate court to substitute its judgment for that of the sentencing court as to the appropriateness of a particular sentence." In *Pena,* the Tenth Circuit put it this way:

> In deciding whether the district court's reasoning comports with these statutory considerations, it is necessary to "leave considerable discretion in the hands of the sentencing judge." The issue is not whether we would have departed to the exact extent that the sentencing judge did, but whether the judge's [explanation] reflects a reasoned, persuasive review of the statutory considerations.

*Pena,* 930 F.2d at 1496 (quoting *United States v. White,* 893 F.2d 276, 278 (10th Cir.1990)).

On the other hand, the cases in which we have *not* allowed a downward departure for aberrant conduct involved facts indisputably showing that the conduct was not aberrant at all. In *Colace,* for example, we overturned a downward departure for aberrant behavior where the defendant committed not one, but at least *twelve* separate bank robberies over a period of not one day, but at least *two months. Colace,* 126 F.3d at 1231–32. Similarly, in *Green,* we stated that the record did not support a finding of aberrant behavior because the defendant was involved in a well-planned marijuana-for-profit operation that extended over a period of at least a few months. *Green,* 105 F.3d at 1323.

Other circuit court decisions in which departures for aberrant behavior have been disallowed also involved evidentiary

records that clearly did not support a finding that the defendant was acting out of character. In *Martinez*, 207 F.3d at 134, the Second Circuit overturned the district court's downward departure where the defendant had participated on at least *three* occasions in a cocaine importation scheme spanning some *thirteen months.* There was no evidence that the defendant suffered from any psychological or other pressures, and the only motivation for the crime appeared to be economic. *See id.* at 138. In *Zecevic*, 163 F.3d at 736, the Second Circuit affirmed the decision not to depart downward where the defendant initiated and carried out an elaborate plan to smuggle drugs into Sweden over the course of several months, and where the defendant presented no evidence to suggest that he was suffering from any psychological disorder or extreme pressures. Similarly, in *United States v. Bradstreet*, 135 F.3d 46, 56 (1st Cir.1998), the First Circuit concluded that the district court had exceeded its discretion in departing downward where the defendant was convicted of criminal dishonesty and had testified dishonestly at his own trial. The court stated that "an aberrant behavior departure is not warranted unless the conduct at issue is both a marked departure from the past *and* is unlikely to recur." *Id.*

In summary, we hold that the district court did not abuse its discretion in finding that Brenda's behavior was aberrant. The district court based its finding on an evaluation of the defendant's mental state at the time of the incident, emotional and psychological pressures she was suffering under at the time, letters of support from family and friends, her lack of criminal history, and the singularity of the event. Even if other judges might have reached a different conclusion,

> [i]f the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are

two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.

*Anderson v. Bessemer City*, 470 U.S. 564, 573–74, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).

### III.

■ Although we hold that the district court did not abuse its discretion in finding that Brenda's conduct was aberrant, that is not the end of our inquiry. We also must determine whether the *extent* of the district court's downward departure in this case was so great as to be unreasonable. *See Henderson*, 993 F.2d at 188 (stating that after reviewing court determines that sentence is not in violation of the law or the result of the incorrect application of the guidelines, the court must then determine whether the departure "was unreasonably high or low from the relevant guideline.") (citing *Williams v. United States*, 503 U.S. 193, 202, 112 S.Ct. 1112, 117 L.Ed.2d 341 (1992)).

■ A district court is required to articulate the reasons for the extent of the departure "in sufficiently specific language to allow appellate review." *Henderson*, 993 F.2d at 189. On appeal we may not search the record for the possible reasons for departure; instead, we must rely solely on the reasons expressed by the court below. *See id.*

The requirement that the district court explain its reasons for assigning a departure is not inconsistent with the abuse of discretion standard promulgated by *Koon.* As the Seventh Circuit has noted, the requirement is "indispensable to furthering the 'fundamental goal of the Sentencing Reform Act, which is to place federal sentencing on an objective, uniform, and rational (or at least articulable, nonintuitive) basis.' " *United States v. Horton*, 98 F.3d 313, 319 (7th Cir.1996) (quoting *United States v. Pullen*, 89 F.3d 368, 371 (7th Cir.1996)).

In this case, the district court offered virtually no explanation for how it arrived at its decision to depart downward by twenty-one levels. Why twenty-one? Why not eleven or fifteen? The court merely stated that it had "much difficulty in sentencing this defendant to time in the penitentiary with the resulting deprivation of her children because of her aberrant behavior." This is not enough. To review the district court's decision with the deference it deserves, we need to know the reasoning behind the degree of departure. We cannot speculate.[3] Therefore, we must remand the case to the district court for resentencing and for an explanation of the reasons for the degree of the departure it allows.[4]

## IV.

In her cross-appeal, Brenda maintains that the district court had discretion to depart downward on the mandatory minimum five-year sentence for the firearm offense. As did the panel before us, we reject Brenda's argument. *See Working*, 175 F.3d at 1155. As a general rule, district courts cannot impose a sentence below a statutory mandatory minimum. *See United States v. Riewe*, 165 F.3d 727, 728–29 (9th Cir.1999); *United States v. Castaneda*, 94 F.3d 592, 594 (9th Cir.1996). An exception to this rule exists if the government moves, pursuant to U.S.S.G. § 5K1.1, for a downward departure based on the defendant's "substantial assistance" to the authorities. In this case, Brenda provided no such assistance to the government, and thus the district court had no authority to depart from the mandatory minimum five-year sentence imposed under 18 U.S.C. § 924.

## V.

For the reasons stated herein, the defendant's sentence for assault with intent to commit murder is VACATED and the matter REMANDED for resentencing. The defendant's sentence for using a firearm in relation to a crime of violence is AFFIRMED.

WARDLAW, Circuit Judge, with whom KLEINFELD, Circuit Judge, joins, dissenting:

I respectfully dissent.

The majority, by agreeing that Brenda Working's conduct warrants departure for aberrance, has found new meaning in the term—one not supported by our jurisprudence and one which, by its sheer expansiveness, is at odds with the views of every other circuit. Brenda Working committed a premeditated attempted murder, "attempted" only because her relentless and cold-blooded assault on her husband was thwarted by his equally relentless will to survive. She compounded her crime by destroying evidence and lying to the police in an effort to conceal what she believed to be the murder she committed. Brenda's crime was not spontaneous: it was well-planned and brutal, and it left a man crippled for life.

The district court was wrong to find that the case lies outside the heartland of attempted murder cases, and wrong to depart 21 levels to sentence Brenda Working

---

3. Because the district court failed to specify the reasoning behind the extent of the departure here, we are unable to discern whether the court took into account the five-year mandatory sentence Brenda was to serve for the firearm offense. We express no opinion on the issue of whether a sentencing court may consider a defendant's entire sentence—including any related statutory minimum sentence—when deciding how far to depart from the relevant guidelines. *Compare United States v. Webster*, 54 F.3d 1, 4 (1st Cir.1995) ("We conclude that in departing from a guideline sentence the district court is free to exercise its own judgment as to the pertinence, if any, of a related mandatory consecutive sentence."), *with United States v. Caldwell*, 985 F.2d 763, 765–66 (5th Cir.1993) (holding that a mandatory minimum sentence under § 924(c) does not, by itself, provide a valid basis for downward departure).

4. We reject the government's request that this case be reassigned to another judge for resentencing. *See United States v. Huckins*, 53 F.3d 276, 280 (9th Cir.1995).

to but one day in prison. The majority opinion's approval of the district court's rote recitation of the aberrant conduct factors makes a mockery of the heartland inquiry required by *Koon v. United States,* 518 U.S. 81, 97–100, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996). It returns us to a time before the Sentencing Guidelines, when judges were free to impose sentences based on their own biases, prejudices, and arbitrary assumptions about human behavior.

### I.

The following facts are drawn from those admitted by Brenda as a basis for her plea, set forth in the presentence report and not objected to by Brenda, or testified to by Brenda.

Brenda and Michael Working were married in 1990. They were a middle-class couple with at least $500,000 in assets. She was employed as a revenue auditor for the State of Washington, Department of Revenue. He was employed by a construction company. He had two sons from a prior marriage, Mitch, who was 18 at the time of sentencing, and Micah, who was 22. They also had two daughters, ages 2 and 4.

By December 1996, Brenda and Michael had sought marriage counseling. Brenda had never been treated for any psychological problems, but was referred during marriage counseling to her family doctor for an anti-depressant medication. There was no evidence of domestic violence in the household, other than Brenda's testimony that she once "pushed Michael down."

On July 16, 1997, Michael petitioned for divorce. In the petition he alleged that he had discovered Brenda sleeping next to his son Mitch. He sought custody of the two girls, for whom he had been caring during the day while working the night shift, and an order restraining Brenda from divesting the marital assets. The show cause hearing was scheduled for August 7, 1997.

Within a week after the filing of the divorce petition, Brenda took action. On July 23, 1997, she paid for a .38 caliber handgun from the Top Kick pawn shop.

During the week-long waiting period before she could pick up the gun, Brenda removed Michael from her job-related health insurance policy. Brenda picked up the gun on Saturday morning, August 1, 1997, six days before the show cause hearing.

At 10:45 that night, Brenda called Michael. Using the pretense that her minivan had broken down on an isolated wooded road, and that she was stranded with their children, she asked Michael to drive out to help her and to pick up the children. When he arrived, she attempted to lure him out of his Ford Bronco by talking of reconciliation. Failing to coax him from the car, Brenda produced the .38 and unloaded it through the window of the Bronco, hitting Michael in the arm, shoulder, and back. Michael ducked, avoiding more serious injury, and was able to escape Brenda's continued assault by driving into an embankment, exiting the Bronco, and running away. Brenda, meanwhile, reloaded the gun with the extra cartridge she had thought to bring along. She then drove the van near Michael, shined the headlights on him, got out, and shot him in the back. He turned, attempted to "rush her" and was met with another slug in his chest. They joined in a struggle. While Michael attempted to wrest the gun from Brenda, she beat him about the head with it. At one point she stopped wrestling, telling Michael that she would take him to the hospital. As he hesitated, she pointed the gun in his face. Michael struck her in the face to remove her eyeglasses, breaking them, and ran away again. As he hid among the woods for over two hours in the middle of the night, Brenda (1) maneuvered the van along the road; (2) parked it with the headlights shining into the woods; (3) left the van to search for Michael in the lighted area; and, failing to find him, (4) systematically repeated this procedure. At one point, two women approached the van and asked Brenda, "Are you okay?" Brenda did not respond but covered her face with her hands to conceal her identity.

Assuming that Michael had not survived the attack, Brenda returned home early Sunday morning. She burned the clothing she had been wearing and hid the eyeglasses Michael had broken beneath a black plastic covering in a flower bed. She then called 911 to report Michael for domestic violence. The police were greeted with Brenda's false tale of having been physically assaulted and threatened with a gun by Michael the night before. She even included in this story a fabricated detail that could have supported her innocence of Michael's murder: she stated to police that while Michael was throwing her to the ground, she heard another voice yell to him, "Let's get going," thus creating the inference that the "killer" was the person with Michael during the alleged attack on her. Brenda came clean only when she learned that, despite her best-laid plans and all her efforts, Michael had managed to survive.

Brenda pleaded guilty to a two-count second superseding information, which charged that Brenda: (1) "with premeditation did assault with intent to kill" Michael; and (2) during this crime of violence "intentionally used a .38 caliber revolver." For Count 1, the statutory maximum penalty included twenty years imprisonment. Count 2 required a consecutive mandatory minimum term of five years.

## II.

The majority begins with a sensible truth: district courts have broad discretion in sentencing. As the Supreme Court has explained, "a district court's decision to depart from the Guidelines ... will in most cases be due substantial deference, for it embodies the traditional exercise of discretion by a sentencing court." *Koon*, 518 U.S. at 98, 116 S.Ct. 2035. Such discretion, however, is not without bounds. The district court may not depart unless it has a legal basis to do so. *See, e.g., United States v. Lipman*, 133 F.3d 726, 729 (9th Cir.1998). In addition:

Before a departure is permitted, certain aspects of the case must be found unusual enough for it to fall outside the heartland of cases in the Guideline. To resolve this question, the district court must make a refined assessment of the many facts bearing on the outcome, informed by its vantage point and day-to-day experience in criminal sentencing.

*Koon*, 518 U.S. at 98, 116 S.Ct. 2035. The majority errs in finding that the district court's "discussion" of the seven factors from *United States v. Colace*, 126 F.3d 1229, 1231 (9th Cir.1997), constituted a "refined assessment" of the supposed facts which remove this case from the heartland. It also incorrectly accepts without examination the district court's factual conclusions that "what happened was the pressure of losing her two daughters" and that what "set off this whole case" was "when the victim in the case accused her of having sexual relations with one of his minor sons." But the most troubling aspect of the majority's opinion is that, having accepted the district court's erroneous conclusions, it deems this "protection of her family" a legitimate, indeed, a justifying, motivation for Brenda's attempt to kill her husband.

Although the district court's and the majority's human sympathies are laudable, they are misplaced. The facts of this case are not sufficiently unusual to remove it from the heartland. The district court's "factual conclusions" about Brenda's motivation are neither supported by the record nor a legitimate basis for finding Brenda's assault out of character. Rather, two factors—one of which, spontaneity or lack of planning, is openly dismissed by the majority and the other, the violent and brutal nature of the crime, is not even addressed—both show that Brenda's attack on her husband was not aberrant. No circuit, including ours, has approved a departure in a case involving both a lack of spontaneity and a violent crime. The premeditated brutality here precludes a finding of aberrant conduct under any test heretofore applied.

### A.

Neither the district court nor the majority engaged in the requisite heartland analysis. Few cases since *Koon* have even addressed how *Koon* may have changed the aberrant behavior analysis. However, both the Eighth and the Tenth Circuits have held that in the aberrant behavior context *Koon* requires both heartland analysis and an inquiry into whether the factors relied upon to find aberrance may be considered. *See United States v. Benally,* 215 F.3d 1068, 1072–77 (10th Cir.2000); *United States v. Kalb,* 105 F.3d 426, 429 (8th Cir.1997).[1] In *Kalb,* the court remanded because the district court had not engaged in *Koon* analysis. *See Kalb,* 105 F.3d at 430.

The district court here actually gave nodding deference to *Koon, see* Maj. Op. at 1099, but neither it nor the majority engaged in a "refined analysis." Both mechanically applied the *Colace* factors in isolation, without regard for how this case compares to others like it. But nothing about this case makes Brenda's conduct less severe than a "heartland" attempted murder case and several factors make it far more egregious.

Brenda planned the murder for at least a week. She purchased a gun and returned to pick it up; she took Michael off her insurance policy; she concocted a story to lure Michael to a deserted area.

Brenda shot Michael from point-blank range. When that did not kill him, she continued the attack until she had satisfied herself that he was dead. At one point during her prolonged midnight mission she ran out of ammunition and reloaded her gun. She pursued Michael relentlessly for at least two hours, carefully and methodically searching for him as he attempted to hide in the woods. Brenda even picked up the empty shell casings and counted them to make sure she left no evidence. She had plenty of time and opportunity, both before and during the commission of the crime, to reflect upon her intended course of action and to change direction. At no time during the horrible crime did Brenda think twice and withdraw from the attack. In fact, she never interrupted her evil scheme nor did she at any time help her wounded and bleeding victim who she knew was lying somewhere in the woods. When she did call 911 for assistance, it was not to save Michael, but to save herself. Thus, the heinousness of this crime places it squarely within the heartland.

The severe injuries to the victim also undermine the district court's decision to depart. The bullets that hit Michael did serious damage. The injuries to his arm required three surgeries and it took two metal plates and 178 screws and pins to hold his shattered upper arm bone in place. Michael will never be able to

---

1. *Koon* may call into question the use of the *Colace* factors by focusing on the relationship between individual factors and the Guidelines as a whole. Several courts have concluded that certain factors may not be considered because they are already accounted for by the Guidelines. For example, courts have rejected the use of economic factors, *see United States v. Martinez,* 207 F.3d 133, 138 (2d Cir.2000) ("[T]he district court improperly relied on Martinez's claim that he was under pressure and motivated by the desire to pay the workers at his factory"), family responsibilities, *see United States v. Burleson,* 22 F.3d 93, 94 (5th Cir.1994) (stating that "a defendant's employment record and his family ties and responsibilities are not ordinarily relevant in determining whether a departure is warranted"); *United States v. Contreras,* 180 F.3d 1204, 1214 (10th Cir.1999) ("[F]amily ties and responsibilities are a discouraged factor."); *United States v. Archuleta,* 128 F.3d 1446, 1451 (10th Cir.1997) (holding that a departure based "entirely on Archuleta's care and support of three dependents" was not warranted); *United States v. Wind,* 128 F.3d 1276, 1278 (8th Cir.1997) (stating that family ties are discouraged and may only be considered in extraordinary cases); *United States v. Dyce,* 91 F.3d 1462, 1466–67 (D.C.Cir.1996) (same); *United States v. Garlich,* 951 F.2d 161, 164 (8th Cir.1991) (same), and a defendant's criminal history, *see United States v. Green,* 105 F.3d 1321, 1323 (9th Cir.1997); *Garlich,* 951 F.2d at 164. By emphasizing the need to assess each factor and its relationship to the structure of the Guidelines, *Koon* may very well have overruled Ninth Circuit law allowing consideration of economic, family and criminal history factors.

straighten his arm. Two bullets, which lodged too close to vital organs and nerves to be removed, are still in Michael's body. A fair number of attempted murders are interrupted or result in no injuries: the murder conspiracy thwarted by the police; the gunshot that misses. Here, however, Brenda was not caught until the damage was done and Michael had taken several bullets. The only things that made this an attempt and not a murder were luck and Michael's resilience.

The majority accepts the district court's "lioness defending her cubs" rationale for the commission of the crime. But Brenda was not defending anything or anyone during this crime—she was the predator, not Michael. The majority also accepts the stressful family situation as support for the aberrant behavior departure. The Workings were in the midst of divorce proceedings. Although it is readily apparent that such proceedings are stressful, they are not unusual.[2] Nor was this an unusual divorce. It involved the questions of custody and division of property that are commonplace among middle-class people with children and assets. Indeed, Brenda's post-breakup outlook was far more secure than many wives in divorce proceedings—she had a good job, significant assets, and a home in which she was living with her children. By approving the district court's reliance on the stress of divorce proceedings, a difficult but commonplace occurrence, as a basis for an aberrant behavior downward departure, the majority disregards the *Koon* requirement of heartland analysis.

### B.

The district court's conclusion that its factual findings support a downward departure is troubling enough. It is even more troubling, however, when one examines the record because the findings are not supported by the evidence. When combined with the district court's comments at the two sentencing hearings, it is clear that the court replaced *Koon* heartland analysis with its own stereotypical perceptions of Brenda, Michael, and their divorce proceedings.

The district court found that "there's no question in this court's mind that what happened was the pressure of losing her two daughters." However, Brenda had custody of their two daughters until she tried to kill their father. Brenda told the court-appointed psychiatrist that Michael was "not a bad guy." Brenda's own testimony also belies the district court's finding. She explained that by trying to kill him she was protecting the kids from "*allegations* that he continuously made on us." (emphasis added). Yet the only allegation she mentioned was the one about Brenda and Mitch sleeping together. She mentioned no allegations about the two children whose custody she supposedly feared losing. Brenda's later testimony is more revealing of her true motivation: "I was just *protecting myself* to get him out of my face, to get him out of the door, to leave me alone." (emphasis added). Brenda tried to kill Michael, not because she worried about losing her daughters, but because she was "protecting herself," and she did not like him "yelling" and "towering over" her. Yet there is no evidence in the record that Michael was physically abusive toward Brenda. Brenda was not helpless. She had a job; she had a car; she managed the money; and there would be a court proceeding in less than a week.

This brings us to the third basis for the district court's decision, that the legal system had "failed her" because Brenda had sought a restraining order against Michael which the state court had denied. The district court asked, "Is that justice, when she sought help from the courts, from the law, that failed her?" The reason Brenda

---

2. If common experience does not bear this out, statistics do. In 1997 in the State of Washington, there were approximately 42,000 marriages and 29,000 divorces. *See* United States Census Bureau, *Statistical Abstract of the United States: 1999* (found at http://www.census.gov/prod). Thus, divorce is almost as common as marriage. Divorces filed in 1990 affected more that one million children nationwide. *See id.*

failed to meet the lenient standard for a restraining order against Michael's alleged domestic violence, however, is that there was none. Michael, as Brenda testified, was not physically violent. So the system did not "fail her"—she was not legally entitled to the relief she sought. By the district court's ruling—and the majority's affirmance—self-help, even to the extent of attempted murder, is now apparently condoned in the Ninth Circuit.

### C.

The majority dismisses out of hand the government's argument that Brenda's conduct cannot be deemed aberrant because it lacked spontaneity. Although it discusses the aberrant behavior law of other circuits, the majority opinion fails to acknowledge that key factors missing from Brenda's conduct—spontaneity and lack of planning—are the very factors relied on by the majority of other circuits in allowing aberrant behavior departures.

The circuits are split about the proper definition of aberrant behavior. A majority of the circuits—the Third, Fourth, Fifth, Seventh, Eighth, Eleventh, and District of Columbia Circuits—have followed the Seventh Circuit's formulation that:

> A single act of aberrant behavior ... generally contemplates a spontaneous and seemingly thoughtless act rather than one which was the result of substantial planning because an act which occurs suddenly and is not the result of a continued reflective process is one for which the defendant may be arguably less accountable.

*United States v. Carey*, 895 F.2d 318, 325 (7th Cir.1990); *see United States v. Paster*, 173 F.3d 206, 213 (3d Cir.1999); *United States v. Marcello*, 13 F.3d 752, 761 (3d Cir.1994); *United States v. Glick*, 946 F.2d 335, 338 (4th Cir.1991); *United States v. Williams*, 974 F.2d 25, 26–27 (5th Cir. 1992); *United States v. Andruska*, 964 F.2d 640, 645 (7th Cir.1992); *Wind*, 128 F.3d at 1278; *Kalb*, 105 F.3d at 429; *United States v. Premachandra*, 32 F.3d 346, 349 (8th Cir.1994); *Garlich*, 951 F.2d at 164; *United States v. Bush*, 126 F.3d 1298, 1301 (11th Cir.1997); *United States v. Withrow*, 85 F.3d 527, 531 (11th Cir.1996); *Dyce*, 91 F.3d at 1470. In *Carey*, the Seventh Circuit reversed a downward departure because the defendant's actions "were apparently the result of extensive planning and were spread out over a fifteen-month period." *Id.* at 325.

An early First Circuit case, *United States v. Russell*, 870 F.2d 18 (1st Cir. 1989), is often cited by majority jurisdictions as the "paradigmatic," aberrant behavior case. *See* Rachael A. Hill, Comment, *Character, Choice, and "Aberrant Behavior": Aligning Criminal Sentencing With Concepts of Moral Blame*, 65 U. Chi. L.Rev. 975 (1998). In *Russell*:

> the driver of a Wells Fargo armored truck, had no criminal record. A bank had mistakenly handed Russell's partner, the truck's messenger, an extra money bag containing $80,000. The men initially yielded to temptation and decided to keep the money. A week later, however, they admitted what they had done. Russell returned all the money that he had kept, and cooperated fully in the investigation of the crime.

*Russell*, 870 F.2d at 19.

A minority of circuits, ours, the First, Second, and Tenth, have allowed district courts to consider a variety of factors, including spontaneity, in determining whether the defendant's actions constituted aberrant behavior. *See United States v. Grandmaison*, 77 F.3d 555, 561–64 (1st Cir.1996); *Zecevic v. United States Parole Comm'n*, 163 F.3d 731, 734–35 (2d Cir. 1998); *Martinez*, 207 F.3d at 136; *United States v. Dickey*, 924 F.2d 836, 838 (9th Cir.1991); *United States v. Takai*, 941 F.2d 738, 743 (9th Cir.1991); *United States v. Fairless*, 975 F.2d 664, 667–68 (9th Cir. 1992); *United States v. Lam*, 20 F.3d 999, 1003–04 (9th Cir.1994); *Green*, 105 F.3d at 1323; *Colace*, 126 F.3d at 1231; *United States v. Pena*, 930 F.2d 1486, 1495 (10th Cir.1991); *United States v. Tsosie*, 14 F.3d 1438, 1441 (10th Cir.1994); *United States*

v. *Jones*, 158 F.3d 492, 500 (10th Cir. 1998).[3]

The nonexclusive factors identified recently by the Second Circuit in *Zecevic* are representative. The Second Circuit looks to:

> (1) the singular nature of the criminal act; (2) the defendant's criminal record; (3) the degree of spontaneity and planning inherent in the conduct; · (4) extreme pressures acting on the defendant, including any psychological disorders from which he may have been suffering, at the time of the offense; (5) the defendant's motivations for committing the crime, including any pecuniary gain he derived therefrom; and (6) his efforts to mitigate the effects of the crime.

*Zecevic*, 163 F.3d at 736.

If we were to adopt the majority test, Brenda's planning would absolutely preclude departure.[4] However, even applying a totality of the circumstances test, the planning, the violent nature of the crime and the lack of any evidence that Brenda attempted to mitigate the effects of the crime make departure inappropriate.

Although courts in minority jurisdictions have not made spontaneity an absolute requirement, it continues to be a crucial factor. For example, the Second Circuit in *Zecevic* refused to apply the departure to Zecevic's drug importation offense because, although he had previously been law-abiding and employed, and his criminal behavior shocked his family, Zecevic "initiated an elaborate scheme to smuggle drugs into Sweden and carried out that plan over the course of several months." *Zecevic*, 163 F.3d at 736; *see also Martinez*, 207 F.3d at 137–38 (rejecting departure for defendant who engaged in thirteen-month scheme to import cocaine); *Contreras*, 180 F.3d at 1213 (stating that six-year involvement in father's drug conspiracy was not a single act of aberrant behavior); *United States v. Ziegler*, 39 F.3d 1058, 1063 (10th Cir.1994) (finding that defendant's long-term involvement with controlled substances precluded departure).

**3.** The Second Circuit only recently joined the circuits holding the minority view. *See Zecevic*, 163 F.3d at 735. Previously, in *United States v. Altman*, 48 F.3d 96, 104–05 (2d Cir. 1995), the Second Circuit affirmed a district court's refusal to apply the aberrant behavior departure in a case in which the defendant over the course of several years defrauded an estate for which he served as executor. It declined to articulate a test but concluded that "the repeated and long-lasting criminal conduct involved here cannot under any circumstances be considered a 'single aberrant act.' " *Id.*

The Sixth Circuit has declined to take sides in the debate. *See United States v. Dalecke*, 29 F.3d 1044, 1047–48 (6th Cir.1994) (stating that under either test, and considering only factors not taken into account in the Guidelines, defendant's fifteen-year possession of an illegal gun was not aberrant); *United States v. Duerson*, 25 F.3d 376, 382 (6th Cir.1994) (declining to choose an approach in affirming district court's decision not to depart in a case in which the defendant began to plan the robbery of a UPS vault several weeks before the crime).

**4.** Courts from majority jurisdictions have found even minimal planning sufficient to defeat an aberrant behavior departure. For example, in *Withrow:*

> [the defendant] and his companions drove around a parking lot with the express purpose of looking for a car to steal. During the time it took Withrow to locate a desirable vehicle to rob, he had an opportunity either to reflect upon the action he was about to take and withdraw or to devise a plan to commit the car theft. Choosing the latter option, Withrow pointed a gun to the driver's head, entered the car, and pulled a stocking over his head to conceal his identity.

*Withrow*, 85 F.3d at 531. Although the district court had erroneously concluded it did not have the discretion to depart, the Eleventh Circuit affirmed because the record did not support an aberrant behavior finding. *See id.; see also Premachandra*, 32 F.3d at 349 ("The robberies that Premachandra committed were neither spontaneous nor thoughtless. To the contrary, the record indicates that the robberies were planned rather than impulsive. Premachandra took steps to avoid apprehension, wearing a facial disguise and covering the rear license plate of the getaway vehicle.").

We have also reversed departures because of planning. In *Green*, we suggested a departure was inappropriate because the crime was well-planned:

> Green's marijuana operation was significant and well-planned; no rationale for the behavior was proffered other than the money Green and his co-defendant planned to share. Green admits he was involved in the scheme for at least a few months; the PSR suggests this was at least two years. Therefore, on this record it does not seem that there were any mitigating circumstances not fully taken into account by the Guidelines.

*Green*, 105 F.3d at 1323. Similarly, in *Takai*, we affirmed a downward departure based on aberrant behavior because the defendants, who pleaded guilty to bribing an INS official, had not acted out of a profit motive and, although they had not been entrapped, had been encouraged by the conduct of the official. The court concluded as to one defendant that "[e]verything points to the conclusion of the district court that she stumbled into something, awkwardly, naively, and with insufficient reflection on the seriousness of the crime she was proposing." *Takai*, 941 F.2d at 743.

Picking up on this theme, in *Colace* we attempted to limit the expanse of the totality of circumstances test and harmonize it with the majority test:

> We have held that there is an "aberrant behavior spectrum" in determining when the aberrant behavior departure should apply. Courts may consider a "convergence of factors" and should take into account the "totality of circumstances" when considering where a defendant's behavior falls along the spectrum and whether to grant a downward departure. But there is a limit; when all is said and done, the conduct in question must truly be a short-lived departure from an otherwise law-abiding life.

*Colace*, 126 F.3d at 1231 (citations and footnote omitted). The court found that Colace's eleven-week crime spree, during which he committed at least a dozen bank robberies, precluded the aberrant behavior departure. *Id.* at 1232.

Courts also have limited the aberrant behavior departure by applying it only in cases that involve relatively minor, nonviolent crimes. The term "aberrant behavior" is found in the introduction to the Sentencing Guidelines, in which the Sentencing Commission explains that it had "not dealt with the single acts of aberrant behavior that still may justify probation at higher offense levels through departures." U.S.S.G. Chapter 1, Part A4(d). The language from the Guidelines speaks only about defendants who could be eligible for probation with a departure.[5] As the Eighth Circuit has stated, "[t]here is nothing in this specific comment, or its context within the Guidelines, that suggests the Commission intended to encourage aberrant behavior departures for murderers, drug dealers, and bank robbers." *Kalb*, 105 F.3d at 429.

Courts have been particularly reluctant to apply the aberrant behavior departure in cases involving extreme violence. In the few cases analyzing aberrant behavior in the context of extreme violence, courts have found that any pre-planning at all will preclude an aberrant behavior departure. For example, in *United States v. Weise*, 89 F.3d 502 (8th Cir.1996), the Eighth Circuit reversed a district court's conclusion that a murder committed after a "heavy night of drinking," *id.* at 504, was aberrant behavior. The court explained:

> Weise's conduct was neither spontaneous nor thoughtless. Unprovoked, Weise got up from the table where Maxwell was seated, walked across the room, selected an eight-inch butcher knife, returned to the table, and then stabbed Maxwell twice in the chest. In these

5. Despite the precipitous departure, the district court did sentence Working to one day of jail time—not merely probation—on the assault with intent to commit first degree murder charge.

circumstances, Weise's conduct was not a single act of aberrant behavior. *Id.* at 507. Similarly, in *Paster,* a man killed his wife with a knife after she told him about her numerous and ongoing affairs. There, the district court found that the killing did not amount to aberrant behavior because "Paster had ample time in the minutes preceding the stabbing to think about whether to murder his wife" and that "the number of times Paster stabbed his wife indicates that he thought about the act as it was being done." *Paster,* 173 F.3d at 212. The Third Circuit affirmed. In *Tsosie,* the Tenth Circuit did find departure appropriate in a second-degree murder case in which a husband cut his wife's boyfriend with a survival knife during an altercation and the boyfriend bled to death. *See Tsosie,* 14 F.3d at 1443. However, unlike Brenda Working, who left her husband to die, the defendant in *Tsosie* took steps to mitigate the seriousness of the crime by attempting to get help and trying to stop the bleeding. *See id.*

Courts have limited aberrant behavior departures to cases involving spontaneous or nonviolent acts. Indeed no case—from this or any other circuit—has approved an aberrant behavior departure in a case involving both planning and extreme violence. The majority thus makes an unwarranted departure from the law of this and every other circuit.

### III.

I return to the issue of discretion. District courts are granted discretion because of their special expertise; when they do not rely on their special expertise, their decisions are less worthy of deference. *Cf. Kalb,* 105 F.3d at 430 ("*Koon* now requires . . . an analysis which, *when properly conducted,* is entitled to deferential review" (emphasis added)).

As the majority acknowledges, "the district court offered virtually no explanation for how it arrived at its decision to depart downward by twenty-one levels." Maj. Op. at 11422. I agree, but would add that the district court offered no reasoned explanation for why it departed *at all.* The court listed factors and found them present or absent but did not engage in heartland analysis, did not explain why Brenda's conduct was less culpable than the Sentencing Guidelines would indicate, and did not connect the factors it considered to its decision to depart.

One of the motivating purposes of the Sentencing Guidelines was to eliminate disparities in sentencing. *See* Stephen Breyer, The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest, 17 Hofstra L.Rev. 1, 5 (1988). In part this consistency is achieved by requiring reasoned findings and meaningful appellate review. On appeal we should determine that the district court considered only proper and legitimate factors and did not base its decision on prohibited factors such as race, sex, and religion. *See* U.S.S.G. § 5H1.10. When the district court provides no justification, or when the facts it recites are contrary to the record, we cannot determine whether such prohibited factors have contributed to a sentencing decision.

Indeed, the district court record only heightens suspicion that prohibited factors, such as gender and class, were at work. Having reviewed the entire record, I have reluctantly come to the conclusion that the district court would not have departed for aberrant conduct if it had been Michael who attempted to kill Brenda in the brutal and premeditated manner of her attack upon him. It is unfortunate that the district court's failure to conduct *Koon* heartland analysis, to do more than simply recite the *Colace* factors, and to reach conclusions not supported by the evidence creates room for the conviction that prohibited factors crept into the decision to depart. Substantial deference to this decision is therefore inappropriate.

I dissent.