# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
          *Plaintiff-Appellant,*

v.

DOROTHY MENYWEATHER,
          *Defendant-Appellee.*

No. 03-50496

D.C. No.
CR-00-01253-R

ORDER
AMENDING
OPINION AND
AMENDED
OPINION

Appeal from the United States District Court
for the Central District of California
Manuel L. Real, District Judge, Presiding

Argued October 13, 2004; Resubmitted December 7, 2005
San Francisco, California

Filed December 16, 2005
Amended May 9, 2006

Before: Andrew J. Kleinfeld, Michael Daly Hawkins, and
Susan P. Graber, Circuit Judges.

Opinion by Judge Graber;
Dissent by Judge Kleinfeld

**COUNSEL**

Nicholas A. Marsh, Trial Attorney, Criminal Division, Public Integrity Section, United States Department of Justice, Washington, D.C., for the plaintiff-appellant.

Elizabeth A. Newman, Deputy Federal Public Defender, Los Angeles, California, for the defendant-appellee.

## ORDER

The opinion filed on December 16, 2005, is amended as follows:

On slip opinion page 16488, line 17, beginning with "Also, because . . . ." and ending on page 16489, line 6, "*Haack*, F.3d at 1003." delete and replace with the following:

> Thus, if the sentence imposed resulted from an incorrect application of the Sentencing Guidelines,[1] and the error was not harmless, ordinarily we will remand to the district court for further sentencing proceedings, permitting the district court on remand to consider the proper Guidelines sentence along with other sentencing factors. *Kimbrew*, 406 F.3d at 1153; *see also United States v. Riggs*, 410 F.3d 136, 136-37 (4th Cir. 2005); *Haack*, 403 F.3d at 1003.

With this amendment, Judges Hawkins and Graber have

---

[1]Other circuits have reached different views on the question of whether appellate review of post-*Booker* sentences should include an assessment of the district court's authority to depart under the Guidelines. *Compare United States v. Selioutsky*, 409 F.3d 114, 118 (2d Cir. 2005) ("An error in determining the applicable Guideline range or the availability of departure authority would be the type of procedural error that could render a sentence unreasonable under *Booker*."); *United States v. Jackson*, 408 F.3d 301, 305 (6th Cir. 2005) (holding that consideration of advisory Guidelines provisions, including departures, is required); *United States v. Crawford*, 407 F.3d 1174, 1183 (11th Cir. 2005) (remanding because grounds for departure were impermissible under the Guidelines); *Haack*, 403 F.3d at 1002 (holding that because § 3553(a)(5) demands consideration of the Sentencing Commission's policy statements, sentencing court must consider whether the Guidelines provide authority to depart); *Crosby*, 397 F.3d at 113 (same); *with United States v. Arnaout*, 431 F.3d 994, 1003 (7th Cir. 2005) ("[T]he concept of 'departures' has been rendered obsolete in the post-*Booker* world."). Because this case involves a sentence imposed pre-*Booker*, we do not decide that post-*Booker* question here.

voted to deny the petition for rehearing and petition for rehearing en banc. Judge Kleinfeld has voted to grant the petition for rehearing and petition for rehearing en banc.

The full court has been advised of the petition for rehearing en banc and no judge of the court has requested a vote on it.

The petition for rehearing and petition for rehearing en banc are DENIED. No further petitions for rehearing or for rehearing en banc may be filed.

---

## OPINION

GRABER, Circuit Judge:

For the third time, the United States appeals the sentence imposed upon Defendant Dorothy Menyweather's conviction by guilty plea to one count of mail fraud, in violation of 18 U.S.C. §§ 1341 and 1346. The government objects to the district court's eight-level downward departure for mental and emotional condition, diminished capacity, and extraordinary family circumstances, a departure that the district court has reimposed twice after remands from this court. *United States v. Menyweather*, No. 01-50438, 36 F. App'x 262 (9th Cir. May 16, 2002) (unpublished disposition) ("*Menyweather I*"); *United States v. Menyweather*, No. 02-50457, 69 F. App'x 874 (9th Cir. July 7, 2003) (unpublished disposition) ("*Menyweather II*").

While this third appeal was pending, the Supreme Court decided *United States v. Booker*, 125 S. Ct. 738 (2005), altering significantly the legal context in which we must decide this appeal. Before *Booker*, we reviewed de novo whether a departure was proper under the constraints set forth in the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines"). *See* 18 U.S.C. § 3742(e). Now, instead, we review the

district court's sentence for "reasonableness." *Booker*, 125 S. Ct. at 765-66. Also, whereas the district court was previously *required* to sentence according to the Guidelines, the Guidelines are now "effectively advisory." *Id.* at 757.

The district court, of course, did not have the benefit of *Booker* and sentenced Defendant under the assumption that the Guidelines were mandatory. We conclude that the district court did not abuse its discretion by downwardly departing from the Guidelines. Moreover, even if the district court strayed from the departure authority available under the Guidelines, any error was harmless in view of the sentencing factors listed in 18 U.S.C. § 3553(a) (which the district court can now consider after *Booker*) and in view of our belief that the court would impose the same sentence again, having steadfastly maintained its position in the face of two opportunities to revise its sentence. Finally, we conclude that the resulting sentence was reasonable, and we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Defendant began working as an administrative employee at the United States Attorney's office in Los Angeles in 1990. In 2000, she was indicted on 10 counts of theft of government funds, mail fraud, and wire fraud. She pleaded guilty to one count of mail fraud and admitted to having used government credit cards for unauthorized personal purchases of between $350,000 and $500,000.

At sentencing, the parties agreed with the probation office that Defendant's offense level was 16 and that her Criminal History Category was I, resulting in a sentencing range of 21 to 27 months. Defendant requested, and the government opposed, a six-level downward departure because of Defendant's family circumstances and mental and emotional condition. In support of her request, Defendant produced the evaluation of Dr. Barbara Cort Counter, a forensic psychologist.

Dr. Counter characterized Defendant as suffering from "severe symptoms of posttraumatic stress" occasioned by two events: her abandonment by her parents as a child and the violent murder of her fiancé, the bloody aftermath of which she witnessed while five months pregnant with their child in 1989. Defendant's theft offense, according to Dr. Counter, was part of a "manic denial of psychic trauma accompanied by compulsive coping behaviors." Dr. Counter had evaluated Defendant for three-and-one-half hours, administered and reviewed a psychological test, spoken with Defendant's counsel, and reviewed letters submitted by Defendant's family members. Defendant made Dr. Counter available for cross-examination, which the government declined at the first sentencing hearing. Nor did the government offer any expert psychological testimony of its own.

Defendant also argued for a departure because of the unusually important role that she played in the life of her daughter, who was 11 years old at the time of the first sentencing hearing in 2001. Since the murder of her fiancé, Defendant has been the sole parent and the primary source of financial support for her daughter.

After hearing argument, the district court departed downward by eight levels, resulting in a sentencing range of zero to 6 months. The court sentenced Defendant to five years of probation, upon the condition that she serve 40 days of her probation, on consecutive weekends, in "a jail-type institution." The court also ordered restitution totaling $435,918, plus 3,000 hours of community service. In addition, Defendant was prohibited from applying for a loan or line of credit without the prior approval of the probation office.

The government appealed, and we vacated the sentence and remanded for resentencing because the district court had given no reasons for "the direction and the degree of the departure." *Menyweather I*, 36 F. App'x at 263. After that first remand, the district court denied the government's

motions for an independent psychological evaluation of Defendant and additional investigation by the probation office, ruling that those procedures could have been, but were not, requested at the initial sentencing. After a hearing at which the government cross-examined Dr. Counter, the court reaffirmed its previous sentence. In support of the sentence, the court recited and adopted specific findings of fact and conclusions of law, as well as noting that it relied on Defendant's post-conviction rehabilitation.

In *Menyweather II*, we again vacated the district court's sentence and remanded, holding that the court (1) erred in relying on post-conviction rehabilitation without giving notice to the government, and (2) failed to explain the *extent* of the departure, as distinct from the *bases* for departure. 69 F. App'x 874-75. On remand, the district court again denied the government's request for further development of the record and reaffirmed its sentence. In support of the sentence, the court adopted expanded findings of facts and conclusions of law that included citations to cases in which downward departures of comparable degree had been affirmed. The court eliminated its earlier reliance on post-conviction rehabilitation.

The government timely appealed the sentence.

LEGAL STANDARDS AND STANDARDS OF REVIEW

**[1]** In the wake of *Booker*, federal sentencing is now governed by 18 U.S.C. § 3553(a), which states that district courts "shall consider" the following factors:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;

> (2) the need for the sentence imposed—

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for—

(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines—

(i) issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code . . . ; and

(ii) that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced; or

(B) in the case of a violation of probation or supervised release, the applicable guidelines or policy statements issued by the Sentencing Commission pursuant to section 994(a)(3) of title 28, United States Code . . . ;

(5) any pertinent policy statement—

(A) issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code . . . ; and

(B) that, except as provided in section 3742(g), is in effect on the date the defendant is sentenced.

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

As the Supreme Court pointed out in *Booker*, § 3553(a) makes the Guidelines sentencing range a required consideration, *see* § 3553(a)(4), but "permits the court to tailor the sentence in light of other statutory concerns as well." *Booker*, 125 S. Ct. at 757; *see also id.* at 767 ("The district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing.").

**[2]** Like many other circuits, we have thus continued to address challenges to a district court's interpretation and application of the Guidelines because, although the district court is not bound by the Guidelines, it still should "consult them for advice as to the appropriate sentence." *United States v. Kimbrew*, 406 F.3d 1149, 1152 (9th Cir. 2005) (citing *Booker*, 125 S. Ct. at 767). Several of our sister circuits have held that, to comply with *Booker*'s mandate that district courts "take [the Guidelines] into account when sentencing," 125 S. Ct. at 767, courts normally must determine and consider the correct Guidelines range. *See, e.g.*, *United States v. Haack*, 403 F.3d 997, 1002-03 (8th Cir.), *cert. denied*, 126 S. Ct. 276 (2005); *United States v. Crosby*, 397 F.3d 103, 111-12 (2d Cir. 2005). Thus, if the sentence imposed resulted from an incorrect application of the Sentencing Guidelines,[1]

---

[1]Other circuits have reached different views on the question of whether appellate review of post-*Booker* sentences should include an assessment

and the error was not harmless, ordinarily we will remand to the district court for further sentencing proceedings, permitting the district court on remand to consider the proper Guidelines sentence along with other sentencing factors. *Kimbrew*, 406 F.3d at 1153; *see also United States v. Riggs*, 410 F.3d 136, 136-37 (4th Cir. 2005); *Haack*, 403 F.3d at 1003.

In this case, the first question is whether the district court began with the correct Guidelines sentence. With respect to that question, the usual standards of review apply: "[We] review[ ] the district court's interpretation of the Sentencing Guidelines de novo, the district court's application of the Sentencing Guidelines to the facts of this case for abuse of discretion, and the district court's factual findings for clear error." *Kimbrew*, 406 F.3d at 1151. The parties agreed, and we see no error in their agreeing to, the Guidelines range of 21 to 27 months.

**[3]** The second question is whether the district court properly understood its authority to depart downward under the then-mandatory Guidelines. Because *Booker* excised the de

---

of the district court's authority to depart under the Guidelines. *Compare United States v. Selioutsky*, 409 F.3d 114, 118 (2d Cir. 2005) ("An error in determining the applicable Guideline range or the availability of departure authority would be the type of procedural error that could render a sentence unreasonable under *Booker*."); *United States v. Jackson*, 408 F.3d 301, 305 (6th Cir. 2005) (holding that consideration of advisory Guidelines provisions, including departures, is required); *United States v. Crawford*, 407 F.3d 1174, 1183 (11th Cir. 2005) (remanding because grounds for departure were impermissible under the Guidelines); *Haack*, 403 F.3d at 1002 (holding that because § 3553(a)(5) demands consideration of the Sentencing Commission's policy statements, sentencing court must consider whether the Guidelines provide authority to depart); *Crosby*, 397 F.3d at 113 (same); *with United States v. Arnaout*, 431 F.3d 994, 1003 (7th Cir. 2005) ("[T]he concept of 'departures' has been rendered obsolete in the post-*Booker* world."). Because this case involves a sentence imposed pre-*Booker*, we do not decide that post-*Booker* question here.

novo review of departures previously mandated by 18 U.S.C. § 3742(e), 125 S. Ct. at 765, we hold that the appropriate standard for reviewing the district court's determination of its departure authority is abuse of discretion, *see Koon v. United States*, 518 U.S. 81, 98-100 (1996), the standard in place before the statutory de novo review was enacted in 2003.[2] *Accord Selioutsky*, 409 F.3d at 119 (holding that abuse of discretion is the appropriate standard for reviewing, as an element of reasonableness review, whether a departure is permissible under the Guidelines).

We conclude that, under this standard of review, the district court did not abuse its discretion by departing downward for diminished capacity under U.S.S.G. § 5K2.13 or by departing downward for family circumstances under U.S.S.G. § 5H1.6. Alternatively, even if the district court abused its discretion by departing downward under the Guidelines, we hold that any error was rendered harmless in this case by the court's expanded authority to consider circumstances related to the sentencing factors in 18 U.S.C. § 3553(a).

## DISCUSSION

A.  *The district court did not abuse its discretion by departing downward for "diminished capacity" under U.S.S.G. § 5K2.13.*

[4] The Sentencing Guidelines identify "diminished capacity" as a factor that may not have been considered adequately by the Sentencing Commission in promulgating the Guidelines—that is, as an encouraged factor for departure.[3]

---

[2] *See* Prosecutorial Remedies and Other Tools to end the Exploitation of Children Today Act of 2003 ("PROTECT Act"), Pub. L. No. 108-21, 117 Stat. 650 (enacting de novo review of departures).

[3] The district court also relied on Defendant's "mental and emotional condition." *See* U.S.S.G. § 5H1.3. We held in *United States v. Smith*, 330 F.3d 1209, 1214 (9th Cir. 2003), *cert. denied*, 540 U.S. 1127 (2004), that the Guidelines limit departure for a defendant's mental condition to that provided for in § 5K2.13. Defendant conceded that, because of *Smith*, the district court's reliance on § 5H1.3 was error under the Guidelines.

U.S.S.G. §§ 5K2.0, 5K2.13. Under the version of § 5K2.13 in effect at the time of Defendant's first sentencing in 2001, a departure is appropriate if "the defendant committed the offense while suffering from a significantly reduced mental capacity," defined as

> a significantly impaired ability to (A) understand the wrongfulness of the behavior comprising the offense or to exercise the power of reason; or (B) control behavior that the defendant knows is wrongful.

U.S.S.G. § 5K2.13. cmt. n.1 (2000).[4] This court has held that post-traumatic stress disorder can be the basis for a departure under § 5K2.13 if the "ailment distorted [Defendant's] reasoning[,] interfered with [her] ability to make considered decisions," and contributed to the commission of the offense in some way. *United States v. Cantu*, 12 F.3d 1506, 1513, 1515 (9th Cir. 1993).

**[5]** The district court found that Defendant suffers from post-traumatic stress disorder and concluded that, because that disorder contributed to her offense conduct, a departure was warranted under § 5K2.13. In reaching its conclusion, the district court did not clearly err by crediting the detailed opinion of a licensed psychologist, in preference to the government's arguments that the psychologist was mistaken or had insufficient information on which to base her conclusion. The government did not challenge Dr. Counter's qualifications, nor

---

[4]Many of the departure provisions in the Guidelines were amended in 2003. U.S.S.G. app. c, amend. 651 (effective Oct. 27, 2003). Section 5K2.13 was amended to impose the additional requirement that the defendant's significantly reduced mental capacity have "contributed substantially to the commission of the offense." *Id.* Because the district court was required to apply the Guidelines provision in effect at the time of Defendant's initial sentencing, *see United States v. Johns*, 5 F.3d 1267, 1272 (9th Cir. 1993) (holding that removal of sentencing discretion can implicate Ex Post Facto Clause), we will consider only the earlier version of § 5K2.13.

did the government offer rebuttal evidence from another psychologist. Although the government's counsel presented persuasive arguments,[5] the district court was not required to accept those arguments. The district court had the opportunity to evaluate Dr. Counter's credibility under cross-examination, and we cannot say that the court clearly erred by finding her credible and by accepting her opinion that Defendant's chronic symptoms of post-traumatic stress were linked to her inability to make reasoned decisions and to her compulsive acquisition behavior.

[6] In view of that finding of fact, which is not clearly erroneous, the court did not abuse its discretion by finding a departure appropriate under U.S.S.G. § 5K2.13. In *Cantu*, we interpreted § 5K2.13 to require that an "ailment distorted [Defendant's] reasoning[,] interfered with [her] ability to make considered decisions[,]" and contributed to the commission of the offense in some way.[6] 12 F.3d at 1513, 1515; *see also United States v. Thompson*, 315 F.3d 1071, 1079 (9th Cir. 2002) (Berzon, J., concurring) (discussing 1998 amendment to § 5K2.13, expressly permitting courts to consider volitional impairments).

---

[5]The government presented four main arguments, several derived from its cross-examination of Dr. Counter at the second sentencing hearing: (1) Defendant lived as a successful and responsible professional and parent, with no psychological treatment, for eight years after the death of her fiancé and before her embezzlement scheme began; (2) Dr. Counter evaluated Defendant only after her indictment and thus could not precisely separate the traumatic effect of Defendant's prosecution from the traumatic effect of earlier events in her life; (3) Dr. Counter did not know that the family members whose letters she had evaluated had benefitted financially from Defendant's scheme; and (4) Dr. Counter had not interviewed any of Defendant's co-workers.

[6]The other requirements of § 5K2.13 are not in dispute here. *See Cantu*, 12 F.3d at 1511 (discussing § 5K2.13's requirements that the offense be nonviolent, that the reduced mental capacity not be caused by voluntary use of drugs, and that the defendant's criminal history not indicate a need for incarceration to protect the public).

B.   *Even if the court abused its discretion under U.S.S.G. § 5H1.6, any error was harmless.*

**[7]** Unlike diminished capacity, family circumstance is a *discouraged* factor under the Guidelines, which state that "family ties and responsibilities and community ties are not ordinarily relevant" in determining whether a departure is warranted. U.S.S.G. § 5H1.6 (2000);[7] *see also United States v. Aguirre*, 214 F.3d 1122, 1127 (9th Cir. 2000) (referring to family circumstance as a "discouraged" factor). A discouraged factor may be grounds for departure under the Guidelines if it is "present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present." *Koon*, 518 U.S. at 96. To determine whether Defendant's family circumstances are extraordinary, we compare this case to others in which district courts have granted downward departures under § 5H1.6, being mindful that some of our cases were decided under de novo, rather than abuse of discretion, review.

**[8]** In *United States v. Leon*, 341 F.3d 928, 931 (9th Cir. 2003), we commented that downward departures based on § 5H1.6 "generally involve situations where the defendant is an *irreplaceable* caretaker of children, elderly, and/or seriously ill family members." We concluded, on de novo review, that a departure was proper because of the particular nature of the defendant's wife's ailments and the unique physical, material, and emotional support that the defendant provided. *Id.* at 933. In *Aguirre*, applying the abuse of discretion standard, we upheld a four-level downward departure where the death of the defendant's husband left their eight-year-old son without a custodial parent. 214 F.3d at 1127. We declined to "second guess the district court's determination that this case involved an unusual family situation." *Id.*

---

[7]The relevant text of § 5H1.6 has not changed since Defendant's initial sentencing.

By contrast, in *United States v. Miller*, 991 F.2d 552, 553 (9th Cir. 1993), and *United States v. Berlier*, 948 F.2d 1093, 1096 (9th Cir. 1991), on de novo review, we held that downward departures were not appropriate because there was nothing unusual about the family situations presented. In each case, the children had another parent to care for them while the defendants were incarcerated. *See Miller*, 991 F.2d at 556 (Tang, C.J., concurring in part and dissenting in part); *Berlier*, 948 F.2d at 1096.

**[9]** The conclusions that we reached in *Leon*, *Aguirre*, *Miller*, and *Berlier* are consistent with the First Circuit's view that, when evaluating departures for family responsibilities under § 5H1.6, courts should assess the nature of the care that the defendant provides to his or her family members and determine whether "there are *feasible* alternatives of care that are relatively comparable" to the defendant's. *United States v. Roselli*, 366 F.3d 58, 68-69 (1st Cir. 2004) (internal quotation marks omitted). Here, the district court essentially concluded that the relationship between Defendant and her daughter was so unusual that care by others was not feasible:

> This case does not simply involve a single mother and child. The facts and circumstances show unusual traumatic circumstances for this mother and child and an unusual relationship between the two. This mother has been the sole parent caring for the child at home and after school. The mother has been consistently employed since the child's birth and her primary source of financial support. The social security benefits the child receives monthly (less than $400) are minimal and insufficient to support a child. [Defendant] has a special relationship with this child who has already lost one parent and has never been without her sole surviving parent excluding absences during brief trips.

The court also relied on the fact that, although Defendant's grandmother and great-aunt live nearby, their housing situation is unsafe.

**[10]** Were we reviewing de novo, we would conclude that Defendant did not prove that she provides care that is irreplaceable or that could not feasibly be provided by another. Under an abuse of discretion standard, however, we hesitate to "second guess" the district court's conclusion that Defendant's relationship with her daughter, and the care that Defendant provides, are unusual as compared with the situation of other single parents. As we did in *Aguirre*, 214 F.3d at 1127, we acknowledge that district courts are "particularly suited" to determine whether a factor makes a case unusual, because they are "informed by [their] vantage point and day-to-day experience in criminal sentencing," *Koon*, 518 U.S. at 98. We therefore conclude that the district court did not abuse its discretion by downwardly departing under § 5H1.6.

**[11]** Alternatively, even if we were to accept the government's argument that the district court erred by departing on this basis under the Guidelines, we can say confidently that any error would be harmless to the government in this case. This is because, under the unusual circumstances present in this third-time appeal, we recognize that the district court could—and would—impose the same sentence again under the now-advisory Guidelines regime.

**[12]** In the "broader appraisal,"[8] available to district courts after *Booker*, courts can justify consideration of family responsibilities, an aspect of the defendant's "history and characteristics," 18 U.S.C. § 3553(a)(1), for reasons extending beyond the Guidelines. "District courts now . . . have the dis-

---

[8]*United States v. Gorsuch*, 404 F.3d 543, 548 (1st Cir. 2005) ("in the post-*Booker* world, the sentencing guidelines are only advisory and the district court may justify a sentence below the guideline level based upon a broader appraisal").

cretion to weigh a multitude of mitigating and aggravating factors that existed at the time of mandatory Guidelines sentencing, but were deemed 'not ordinarily relevant,' such as age, education and vocational skills, mental and emotional conditions, employment record, and *family ties and responsibilities.*" *United States v. Ameline*, 409 F.3d 1073, 1093 (9th Cir. 2005) (en banc) (Wardlaw, J., concurring in part and dissenting in part) (emphasis added). The difficulty of providing appropriate care for a child of a single parent may, when balanced against factors such as the nature of the offense, § 3553(a)(1), deterrence to criminal conduct, § 3553(a)(2)(B), and protection of the public, § 3553(a)(2)(C), warrant a sentence outside the Guidelines.

[13] Furthermore, as we have said, we have no doubt that the district court would impose the same sentence under the advisory Guidelines regime, as the district court has imposed the identical sentence three times already. *See Selioutsky*, 409 F.3d at 118 n.7 (noting court arguably could forego review of the correctness of the departure under the Guidelines if it had a "sufficient basis for believing that the same sentence would have been imposed as a non-Guidelines sentence," because "any error in using departure authority to select the sentence that was imposed would be harmless"). The district court clearly believed that, in this case, the potential harm to the close relationship between this single parent and her child outweighed the benefits of a prolonged period of incarceration to achieve deterrence, protection of the public, and punishment. Indeed, the court stated that the conditions of Defendant's probation were "as strenuous as any other sentence I could impose." *Cf.* 18 U.S.C. § 3553(a)(3) (directing courts to consider "the kinds of sentences available"). We also observe that the district court's goal of obtaining restitution for the victims of Defendant's offense, 18 U.S.C. § 3553(a)(7), is better served by a non-incarcerated and employed defendant. In sum, family circumstances were a permissible consideration here—if not under the Guidelines, then as part of a balancing of factors under § 3553(a).

C. *The length of the sentence was reasonable, considering the combination of factors.*

Finally, we turn to the government's objections to the length of the sentence (or, more precisely, to the extent of the downward departure from the Guidelines offense level). In post-*Booker* parlance, this is essentially a challenge to the "reasonableness" of the ultimate sentence.

As a threshold matter, the government contends that the district court failed to give reasons for the extent of its departure from the Guidelines and, thereby, failed to comply with our mandate in *Menyweather II*. We agree that, after *Booker*, the district court still is "required to articulate the reasons for the extent of the departure in sufficiently specific language to allow appellate review." *United States v. Working*, 224 F.3d 1093, 1102 (9th Cir. 2000) (en banc) (internal quotation marks omitted); *see* 18 U.S.C. § 3553(c) (requiring a statement of reasons for the particular sentence imposed); *see also Crosby*, 397 F.3d at 116 (noting that § 3553(c) was not excised by the Supreme Court in *Booker*).

But we do not agree that the district court failed to explain the extent of its departure here. In response to our remand in *Menyweather II*, the district court explained the extent of its departure from the Guidelines by supplementing its factual findings and, for each factor on which it based its decision to depart, citing and describing several other cases in which courts had departed downward on similar facts. Although the court did not make express comparisons between Defendant's case and the cited cases, the cited cases are facially similar and their presence alone implies that a comparative analysis led the court to select an eight-level departure. More importantly, as this court required in *Working*, 224 F.3d at 1102, the supplemented factual findings and comparative citations provide a basis for us to review, on the merits, whether the length of the sentence was reasonable.

Even before *Booker*, our task was to determine whether the extent of a departure was reasonable, so our cases applying abuse of discretion review to that question remain relevant after *Booker*. *See United States v. Alfaro*, 336 F.3d 876, 881 (9th Cir. 2003) (citing 18 U.S.C. § 3742(e)(3) and reviewing for abuse of discretion whether the extent of a departure was reasonable); *United States v. Working*, 287 F.3d 801, 806 (9th Cir. 2002) (same). We commonly have performed that review by comparing the defendant's case with other published cases in which departures have been affirmed. *See, e.g.*, *United States v. Green*, 105 F.3d 1321, 1323 (9th Cir. 1997). In *Green*, we noted that departures for a particular factor had generally ranged between one and five levels; therefore, we concluded that a 15-level departure was an abuse of discretion. *Id.*

**[14]** Our cases show that downward departures for diminished capacity generally range between one and four levels. *See, e.g.*, *United States v. Malley*, 307 F.3d 1032, 1033-34 (9th Cir. 2002) (five-level departure; combination of diminished capacity and extraordinary acceptance of responsibility); *United States v. Garza-Juarez*, 992 F.2d 896, 913 (9th Cir. 1993) (four-level departure; combination of the defendant's panic disorder with agoraphobia and coercion under § 5K2.12); *United States v. Lewison*, 988 F.2d 1005, 1007 (9th Cir. 1993) (four-level departure under § 5K2.13 for long-standing psychological problems was "well within line with other adjustments established by the guidelines for various mitigating factors indicating diminished culpability"). Downward departures for extraordinary family circumstances most often fall within a similar range. *See, e.g.*, *Leon*, 341 F.3d at 929, 933 (six-level departure); *Aguirre*, 214 F.3d at 1128 (four-level departure); *Roselli*, 366 F.3d at 67, 70 (three-level departure).

**[15]** Considering those cases, and the sentencing factors in § 3553(a), we cannot say that an eight-level downward departure for the combined effect of two factors—Defendant's

diminished capacity and family circumstances—was unreasonable. The district court expressly justified its sentence of probation by saying that it viewed the conditions of probation as very "strenuous," yet without causing a significant disruption of the parent-child relationship. The nature of the offense was not such that incarceration, as distinct from strict controls on Defendant's financial activities, was necessary to protect the public or afford deterrence. *See* 18 U.S.C. § 3553(a)(2); *cf. Working*, 287 F.3d at 809 (remanding because the "court's reasoning was insufficient to justify a departure that resulted in no sentence at all for a serious crime of violence"). Also, as we have mentioned, a sentence of probation may have made Defendant better able to provide restitution to the victims of her crime, *see* 18 U.S.C. § 3553(a)(7).

**[16]** Although we are unlikely to have selected this particular sentence if we were doing the sentencing, that is not our function. In these circumstances, we find no abuse of discretion in the sentence (upon Defendant's conviction for a single count of mail fraud) consisting of five years of probation, on the condition that Defendant serve 40 days in jail on consecutive weekends; plus $435,918 in restitution, to be paid first to the individual victim; plus 3,000 hours of community service; plus a prohibition from applying for a loan or line of credit without the prior approval of the probation office.

AFFIRMED.

---

KLEINFELD, Circuit Judge, dissenting:

I respectfully dissent. The new sentencing regime does not justify this abdication of our duty of review. The majority's application of review for abuse of discretion equates it with no review.

For many years, Menyweather worked in administration for the United States Attorney's office in Los Angeles. During

this period, she used her government credit card and other peoples's cards for almost three years to steal over $435,000 — that the government has been able to verify — and faked certifications and computer entries to cover up her thefts. Yet she has not been sent to prison.

Menyweather went to work for the United States Attorney in 1990 as a clerical employee, so she was a long trusted member of the office when she got promoted to procurement in 1997. Almost immediately, she began stealing, mostly by using the procurement credit cards to buy such things for herself as clothes, gift certificates, appliances, cellular phones and service, car repairs, insurance, and even computers. She sold some of what she stole, including $12,500 worth of computer equipment. She also took trips to Alaska, Australia, and Israel, as well as Palm Desert, Dallas, Columbus, Birmingham, Houston, and Monroe, Louisiana, all on stolen money. Menyweather planned a week long cruise in the Carribean, bought with stolen money, but the government was able to stop payment on it when she was caught.

In addition to stealing for herself, Menyweather used stolen money to dramatize herself as a Lady Bountiful. She bought her sister-in-law in Tacoma a computer, printer, monitor and software. And she bought a dozen computers for the needy. About $20,000 of the stolen money was contributed to charitable organizations. She took numerous children to Las Vegas, twice, and to a church conference in New Mexico, all on the government nickel. She took eight people to a church conference in Atlanta. She even bought eight plane tickets to Israel. Her and her friends's and beneficiaries's travel cost the government about $150,000. And she showered her friends and relatives with such gifts as lawnmowers, computers, cell phones and service, video games, and televisions. Nordstrom's alone got $53,800 of Menyweather's bounty. The government found over a thousand crooked transactions when her thievery was finally discovered.

The government caught up to her and managed to stop payments on some of the more recent transactions after she had stolen $419,521. This left a travel agency stuck for $16,397. A lady at the travel agency, Ms. Kenichi Kimura, who had thought she was dealing with the government — a reasonable assumption since she was selling travel to a United States Attorney's procurement agent on a government credit card — wrote a victim impact statement explaining that she was required to pay back the loss to her company with monthly deductions from her salary, amounting to a fifteen to twenty percent pay cut that she could not afford. The violation of trust had driven her to seek counseling. She wrote, "[t]o me, working for the Government itself is the steady, fair and irresistible reason to believe. Maybe, I am Japanese and don't know much about the America. What else can people, including American believe if they can't believe the Government."

Menyweather had suffered two severe misfortunes in her life. When she was a child, her father deserted her family and her mother gave her to her grandparents to raise. When she was a young adult, the year before she went to work for the United States Attorney (eight years before the crimes), her fiancee was shot dead when she was five months pregnant with his child. She had been visiting friends nearby, and found his body as he lay bleeding to death.

Based on three and a half hours of interviews and tests, discussions with Menyweather's lawyer, and examination of discovery materials and letters from relatives, a psychologist, Barbara Counter, Ph.D., told the court that in her opinion, Menyweather's thefts were caused by post-traumatic stress from these misfortunes. She was, Dr. Counter opined, "filling the social and emotional voids created by her unacknowledged and untreated retraumatization, depression and despair with whatever external objects she could collect. She self-medicated" with shopping and trips. However, Dr. Counter had never seen Menyweather before Menyweather's lawyer brought her in. Dr. Counter conceded that meeting Menywea-

ther after she got fired and arrested made it impossible to distinguish the claimed post-traumatic emotional disorder resulting from the traumas years before from the effects of the trauma of a federal felony prosecution.

The presentence report for Menyweather's 2001 sentencing recommended a guideline range of 21 to 27 months, $16,397 restitution to Ms. Kimura, the travel agent, and $419,521 restitution to the U.S. Attorney's office. The defense urged a downward departure to twelve months in custody (two over the summer, the rest on weekends) because of Menyweather's psychological condition as described by Dr. Counter and because Menyweather was solely responsible for her eleven year old daughter. The government opposed the departure, pointing out that the trauma of her fiancee's murder preceded the beginning of her thefts by almost eight years and, in between, she had completed college, completed a successful internship, won awards, and generally done very well. The government also pointed out that U.S.S.G. § 5H1.6 generally made family responsibilities an irrelevant consideration for departure.

Moreover, the government highlighted the fact that there is nothing extraordinary about being a single mother and that Menyweather had chosen to leave her daughter without her supervision when she went on ten trips to Alaska, Australia, Israel, and numerous other destinations during her travels on stolen money. She had not even bought a ticket for her daughter (though she had for numerous other people) for the planned Carribean cruise that the government discovered and stopped.

The district judge, without explanation, departed downward eight levels. He gave Menyweather an even more lenient sentence than her attorney had asked for. The district court put Menyweather on probation for five years with conditions of restitution, community service and 40 days of jail to be served

on weekends. The judge did nothing to see that the travel agent got paid back before the government.

We vacated and remanded for resentencing, because the court had not provided reasons for the downward departure and had failed to order that the travel agent be paid her restitution first, pursuant to 18 U.S.C. § 3664(I).[1]

On remand, the government moved for leave to have its own psychiatrist evaluate Menyweather and for time to do an independent investigation of child care resources for Menyweather's daughter if Menyweather was sent to prison. The district court denied the motions. At the sentencing hearing, the judge would not allow the prosecution to show that all of the letters Dr. Counter relied on were from relatives upon whom Menyweather had showered her stolen largesse. The judge then imposed the same sentence he had the first time. The only change was that this time he explained why he was departing. He listed several "justifications": Menyweather "is a single mother;" her thirteen year old daughter was entirely dependent on her; Menyweather and her daughter lived in a gated apartment community and her daughter attended private school, but if she were imprisoned her daughter would live in an unsafe neighborhood with her great aunt and grandmother; Menyweather had been traumatized, as Dr. Counter had said, yet had never received psychiatric care; and, finally, "post-conviction rehabilitation."

We reversed and remanded again. We noted that "post-conviction rehabilitation" might be a prohibited basis for departure under U.S.S.G. § 5K2.19,[2] and, without giving the

---

[1]18 U.S.C. § 3664(I) ("In any case in which the United States is a victim, the court shall ensure that all other victims receive full restitution before the United States receives any restitution.").

[2]U.S.S.G. § 5K2.19 ("Post-sentencing rehabilitative efforts, even if exceptional, undertaken by a defendant after imposition of a term of imprisonment for the instant offense are not an appropriate basis for a downward departure when resentencing the defendant for that offense.").

government an opportunity to address this issue, the judge had handwritten it into his justification for departure after the sentencing hearing. We also noted that the judge had not given any justification for why the departure should be eight levels (which brought the bottom of the guideline range to zero months).

In the district court again after this second remand, the government once more sought an opportunity to have its own psychiatrist evaluate the post-traumatic, self-medication explanation for Menyweather's crimes, and to investigate Menyweather's ability to provide for suitable child care among her extended family in the Los Angeles area if she was imprisoned. The government also sought an opportunity to investigate and contest the "post-sentencing rehabilitation" issue. Again, the judge denied the motions. By this time the daughter was 14 years old. The judge told the prosecutor "No second bites at the apple, counsel," even though our mandate vacating the sentence in effect required a second bite. The judge then reimposed the same sentence saying, "there's nothing that's changed in the matters in which I am departing." The only additional justification was the judge's signature on findings defense counsel submitted to protect the sentence from further appeal. In it he adopted the post-traumatic stress theory, compared the gated community and private school with the bad neighborhood, and justified the eight level departure by the "combination of circumstances under 5K2.0" showing "diminished capacity, extraordinary mental and emotional condition and extraordinary family circumstances." The findings submitted by defense counsel omitted the "post-conviction rehabilitation" reason that we rejected previously.

Faced with the district judge's obdurate refusal to comply in any serious way with our mandates, we have given up. *United States v. Booker*[3] gives us our excuse, but it is no more

---

[3]*United States v. Booker*, 125 S.Ct. 738 (2005).

than an excuse, because a serious reading of the facts and the law of sentencing still requires that this sentence be vacated.

*United States v. Booker* "excised" the statutory provisions making the sentencing guidelines mandatory and providing for *de novo* review of departures, but held that "the remainder of the Act" imposing the guidelines is constitutional.[4] The Act "requires judges to take account of the guidelines together with other sentencing goals. See 18 U.S.C. § 3553(a) (Supp. 2004)."[5] "And the Act nonetheless requires judges to impose sentences that reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, protect the public, and effectively provide the defendant with needed educational or vocational training and medical care."[6] Sentences are still to be reviewed by the Courts of Appeal, and review is to be for "unreasonableness" with respect to these statutory goals of sentencing.[7] A serious look at the legal criteria for sentencing requires that the sentence imposed be deemed unreasonable.

Does 40 days to serve on weekends "reflect the seriousness of the offense" of a trusted employee engaging in a long running and elaborate scheme and coverup in which she stole over $435,000? Obviously not. Impulsive shoplifters with a record can get a lot more time than that,[8] and Congress regards stealing more than $1000 in public money as a felony with a 10 year maximum sentence.[9] Does 40 days to serve for this crime "promote respect for the law"? It makes a joke of the law. Does the sentence "effectively provide the defendant

---

[4]*Id.* at 764.

[5]*Id.* at 744.

[6]*Id.* at 764-65.

[7]*Id.* at 765-66.

[8]*Lockyer v. Andrade*, 538 U.S. 63 (2003) (upholding a 25 year to life sentence under California three strikes law when the third offense was shoplifting items worth less than $100).

[9]18 U.S.C. § 641.

with needed educational or vocational training and medical care"? The only person who got counseling after the crime was the disillusioned travel agent. The court did not require Menyweather to undergo any kind of treatment for the "post-traumatic stress" that the court used as a justification in giving her this lenient sentence.

Does the sentence "afford adequate deterrence"? Far from deterring crime, the sentence invites it. $435,000 is a substantial amount of money, a life-changing amount of money for most people. Many people would eagerly volunteer to spend 40 days in jail on weekends to become that rich. They would earn almost $11,000 per night. A lot of jails count any portion of a day as a day, so a person can "serve two days" by arriving at 11:30 Friday night, leaving enough time for booking before midnight, and check out just after midnight to go home to sleep. "Protect the public"? There is nothing in the record to suggest that Menyweather will not steal again, if given the opportunity. Even the one member of the public personally and individually suffering from the crime, the travel agent, was not protected until we ordered the district judge to insure that she got her restitution first.

What about the sentencing guidelines? After *Booker*, they are not dead, just "advisory" instead of mandatory. The guidelines are contrary to the sentence imposed. That is why the judge departed from them. Review for unreasonableness is still review. We may not properly defer to an unreasonable sentencing decision. Unless and until Congress returns sentencing to what it used to be before the guidelines, a totally unreviewable discretionary trial court decision, we are supposed to assure that sentences are reasonable.

The primary justification for the strikingly lenient sentence was the post-traumatic self-medication by shopping theory that Dr. Counter articulated. Under the guidelines manual the district court used for sentencing, "mental and emotional con-

ditions are not ordinarily relevant" to departures[10] where the defendant does not suffer from "significantly reduced mental capacity,"[11] though a mental or emotional condition may justify departure if present to such an "unusual degree" to distinguish the case from " 'heartland' cases."[12] Because Menyweather's sentence flies in the face of all the other sentencing considerations the statute imposes, it can be justified on this ground only if the ground is strong indeed. It is not.

First, the departure suffers from the same defect that led us to vacate the sentence because of the "post-conviction rehabilitation" justification the district court had previously mentioned, that the district court never gave the government a fair chance to oppose it. The court refused to allow the government to have its own psychiatrist evaluate Menyweather (because the judge repeatedly refused to allow the government to obtain its own psychiatric examination, I am nonplussed by the majority opinion's attack on the government for failing to "offer any expert psychological testimony of its own."). Second, the evidence for Dr. Counter's opinion was little more than speculation about how the defendant must have felt considering that her father had abandoned the family when she was little and her fiancee had been murdered. Menyweather never got psychiatric treatment for her traumas. Dr. Counter saw her for at most 3-1/2 hours, at a time when Menyweather had just been traumatized by getting fired and arrested, so that most recent trauma doubtless affected her emotionally when Dr. Counter evaluated her. The only individual who needed and obtained counseling, so far as the record shows, was Menyweather's victim, the travel agent, whose mental (and financial) condition the district court and prosecutor ignored. Third, Menyweather's educational and vocational success subsequent to the traumas — a college

[10]U.S.S.G. § 5H1.3 (2000).

[11]U.S.S.G. § 5K2.13 (2000).

[12]U.S.S.G. § 5K2.0 (2000); *United States v. Cantu*, 13 F.3d 1506 (9th Cir. 1993).

degree and considerable vocational success for eight years —
was inconsistent with the theory that she was too disabled to
function normally by these traumas.

The other rationale for letting Menyweather go with 40
days of weekend time was that she was a single mother whose
child would live with relatives in a bad neighborhood, instead
of the gated community and private school Menyweather pro-
vided, if Menyweather went to prison. It is hard to see how
Menyweather could continue to provide this superior standard
of living after getting fired for stealing. The district judge
repeatedly denied the government's motion to investigate the
child care situation, thereby preventing the record from being
further developed. The guidelines advise that "family ties and
responsibilities" are not ordinarily relevant to departures,[13]
though like mental health they can be in extraordinary cases.[14]
We,[15] like other circuits,[16] have held that family circumstances
should ordinarily be considered only when extraordinary
harm to family dependents exceeds the normal disruption
caused by imprisonment. But there is nothing "extraordinary"
or "unusual" as those terms are used in the sentencing guide-
lines about single mothers. Nor is there anything extraordi-
nary or the slightest bit unusual about a criminal's family
suffering from loss of companionship and lowered income
when the criminal is caught and sent to prison. Indeed, peo-

---

[13]U.S.S.G. § 5H1.6 (2000).

[14]U.S.S.G. § 5K2.0, cmt.

[15]*United States v. Berlier*, 948 F.2d 1093, 1096 (9th Cir. 1991), *over-
ruled on other grounds* in *United States v. Aguirre*, 214 F.3d 1122 (9th
Cir. 2000).

[16]*United States v. Chestna*, 962 F.2d 103 (1st Cir. 1992) (the fact that
defendant was single and had four small children was not "an unusual
family circumstance."); *United States v. Mogel*, 956 F.2d 1555 (11th Cir.
1992) (single mother of two minor children was not entitled to a down-
ward departure for extraordinary family circumstances); *United States v.
Headley*, 923 F.2d 1079, 1083 (3d Cir. 1991) ("the imprisonment of a sin-
gle parent was not extraordinary," even where the woman had five minor
children).

ples's concern about avoiding this harm to their families is among the most important deterrents to crime.

Nor is it clear that Menyweather's influence on her daughter is superior to the moral training her nearby relatives would provide, because, though poorer, they have not stolen $435,000. Being richer is not the same thing as being better. Since Menyweather has traveled all over the world without taking her daughter along, leaving her instead in the care of others, the record does not support a determination that she cannot travel for a time to prison without taking her daughter along. There are a lot of single mothers. No class of persons can be immunized from imprisonment without assisting recruitment for criminal enterprises by providing an incarceration-proof labor force.

That leaves us with the last and most important of the statutory criteria emphasized by *Booker*, whether the 40 days to be served on weekends "provide[s] just punishment."[17] Where is the justice in Menyweather avoiding prison and getting 40 days to serve on weekends for stealing $435,000, when others steal a VCR and face 25-years to life in prison?[18] Does drawing a district judge whose sentencing philosophy is idiosyncratic make so idiosyncratic a sentence "just"? An excessively lenient sentence like this causes cynicism, not only among people in prison, where the luck-of-the-draw sentencing interferes with rehabilitation, but among the law-abiding public. People have second thoughts about doing the right thing when those who do the wrong thing prosper and avoid punishment.[19] Injustice is corrosive.

---

[17]*United States v. Booker*, 125 S.Ct. 738, 744 (2005).

[18]*Ramirez v. R.A. Castro*, 365 F.3d 755 (9th Cir. 2004); *See*, *also*, *Lockyer v. Andrade*, 538 U.S. 63 (2003) (upholding a 25 year to life sentence under California three strikes law when the third offense was shoplifting items worth less than $100).

[19]*Cf.* Jeremiah 12:1-2.

Some people think defendants who have themselves suffered misfortunes should not go to prison, or defendants who commit nonviolent crimes, or women, or mothers, or single mothers. But none of these theories has been adopted by Congress or by the sentencing guidelines. I am able to explain, really explain, what the district judge has insisted on doing in the face of repeated remands only on the basis of some rejected theory such as this.

Some judges, such as the district judge in this case,[20] are known for strongly held views. And there was strong resistance among some district judges, particularly those with long pre-guidelines experience, to the restrictions on their sentencing discretion when the guidelines came into force eighteen years ago. Now that the guidelines have been reduced from mandatory to advisory status, our review authority may be more rather than less important than it was before, to prevent idiosyncracy from altogether overtaking sentencing consistency. A sentence like the one in this case is just the sort of red flag that makes legislators wonder whether the courts need mandatory minimum sentences to assure protection of the public. The sentence in this case, imposed the third time after two remands, should be vacated again and the district court should be instructed to assign the case to another judge.[21]

---

[20]*See*, e.g., *United States v. Sears, Roebuck & Company, Inc.*, 785 F.2d 777 (9th Cir. 1986) (remanding case to a new judge after the judge repeatedly dismissed an indictment even after the case was remanded to him by the Court of Appeals with direction that the indictment be reinstated); *United National Insurance v. R & D Latex Corp.*, 141 F.3d 916 (9th Cir. 1998) (remanding to a different judge after the judge twice granted summary judgment without articulating reasons); *cf. In re Complaint of Judicial Misconduct*, 425 F.3d 1179 (9th Cir. 2005).

[21]*U.S. v. Atondo-Santos*, 385 F.3d 1199 (9th Cir. 2004) (remanding with instruction that the case be assigned to a different judge, pursuant to the Court's supervisory power under 28 U.S.C. § 2106, after two remands and stating, "[i]n light of the history of this case and our previous remands, it is clear that the district court would have substantial difficulty in putting out of its mind its repeated, previously-expressed views that a 66 month sentence is appropriate in this case.").